# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

|  |  |
|---|---|
| JESUS NABARETTE ANGUIANO, | Case No.  1:14-cv-01779-SAB-HC |
| Petitioner, | ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS |
| v. | |
| SCOTT FRAUENHEIM, | |
| Respondent. | |

Petitioner is a state prisoner, represented by counsel, proceeding with a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254.  Respondent is the Warden of Pleasant Valley State Prison in Coalinga, California.  Both parties have consented to the jurisdiction of the Magistrate Judge pursuant to 28 U.S.C. § 636(c).  (ECF Nos. 4, 7).

## I.

## BACKGROUND

Petitioner is currently in the custody of the California Department of Corrections and Rehabilitation pursuant to the 2012 judgment of the Tulare County Superior Court for attempted premeditated murder with the allegations that he personally used a deadly or dangerous weapon in the commission of the offense, inflicted great bodily injury on the victim, and committed the

1    offense for the benefit of a criminal street gang.  (ECF No. 1 at 9-10). [1]  He was sentenced to

2    fifteen years to life imprisonment.  (ECF No. 1 at 10).

3          Petitioner timely filed a notice of appeal.  (LD 1).[2]  On April 23, 2013, the California

4    Court of Appeal, Fifth Appellate District, affirmed the conviction and judgment.  (LD 4).  On

5    May 29, 2013, the Court of Appeal denied Petitioner's petition for rehearing.  (LD 5). On August

6    14, 2013, the California Supreme Court denied the petition for review.  (ECF No. 1 at 2).

7    Petitioner did not file any habeas petitions in state court.

8          Petitioner alleges that (1) the trial court erroneously denied his mistrial and new trial

9    motions; (2) his trial counsel was ineffective for failing to call the gang expert, Mr. Hurtado, or

10   another gang expert; and (3) the trial court violated his due process and fair trial rights by

11   including improper language in the CALCRIM No. 1403 jury instruction.

## II.

## STATEMENT OF FACTS

15         The record from the California Court of Appeal is as follows: [3]

16   Around 10:00 p.m. on Wednesday, January 13, 2010, Benny Gallegos went to the
     Sports Zone Pizza and Grill in Visalia to meet Deliliah Echavarria. At that time,
17   Gallegos's head was shaved so that several tattoos were visible. He had a "CA"
     tattoo on top of his head, which meant "California." A tattoo on the side of his
18   head said "My Crazy Life." A tattoo of "SD" was below his left ear. Gallegos
     testified the "SD" tattoo stood for the San Diego Padres and Chargers, and he was
19   a fan of both teams, which had blue uniforms.

20   Gallegos testified he also had a tattoo on the back of his head which said: "BPM."
     It meant "Brown Pride Mexican," which was his "hood" in Corcoran, Kings
21   County. Gallegos testified that "BPM" was an independent gang and it was not
     allied with the Nortenos or Surenos. However, Gallegos admitted that he played
22   Sureno gang music in his car, and he had previously been called a "scrap," a
     derogatory word for Surenos.
23
24   Gallegos testified he was wearing khaki pants, and a white and black striped shirt
     when he entered the bar that night. Gallegos admitted that he had a black bandana

25   _____

     [1] Page numbers refer to the ECF page numbers at the top right of the page.
26   [2] "LD" refers to the documents lodged by Respondent with the answer on February 6, 2015.  (ECF No. 9).

     [3] The Fifth District Court of Appeal's summary of the facts in the April 23, 2013 opinion is presumed correct. See
27   28 U.S.C. §§ 2254(d)(2), (e)(1).  Petitioner does not present clear and convincing evidence to the contrary; thus, the
     Court adopts the factual recitations set forth by the state appellate court. See Vasquez v. Kirkland, 572 F.3d 1029,
28   1031 n.1 (9th Cir. 2009) ("We rely on the state appellate court's decision for our summary of the facts of the
     crime.").

hanging out of his back pocket. A security guard asked him to put it away. Gallegos folded the bandana and put it in his pocket. Gallegos testified his bandana was black, it was not blue, and he was not showing any gang colors that night.

**Gallegos's conduct in the bar**

Shon Kekauoha was a security guard and bouncer at the Sports Zone. Kekauoha testified that the bar's patrons were usually "people who we thought to be more or less gang affiliated. They would come in large numbers; predominately red shirts, red jerseys, red hats. It was more or less unofficially known as a Norteno bar or Norteno spot, really." The bar had a dress code to "keep down any gang presence there as far as clothing articles." The bar did not allow patrons to wear bandanas because of possible gang affiliations. Kekauoha and the other bouncers often had to kick out self-admitted Norteno patrons who got into gang disputes with other bar patrons who represented where they were from.

Kekauoha testified that when Gallegos arrived at the bar, he was showing a blue bandana out of his back pocket. Kekauoha was positive that Gallegos's bandana was blue and not black. Kekauoha also saw Gallegos's tattoos. Kekauoha told Gallegos that the bandana was not allowed and to either put it entirely in his pocket or take it back to his car. Gallegos put it in his pocket and entered the bar with his girlfriend.

Kekauoha testified that once Gallegos was inside the bar, he pulled the blue bandana out of his pocket and displayed it. Kekauoha again told Gallegos to put away the bandana, and Gallegos complied. Later in the evening, Kekauoha saw Gallegos dancing while the blue bandana was wrapped around his knuckles. Another security guard told Gallegos to put the bandana away.

Kekauoha testified that despite the admonishments about the bandana, Gallegos appeared to be "minding his own business" while he danced with his girlfriend. Gallegos testified he did not have any conflicts with anyone in the bar. He did not notice any Norteno gang members in the bar; he did not see anyone throwing gang signs; and he did not hear any gang slurs. However, Gallegos admitted that at one point, he "threw up a dub" sign for "W," representing "West Coast," but he did not direct the sign at anyone.

**The stabbing**

Gallegos testified he was having a drink when he suddenly felt "some sharp pains" in the back of his head. He raised his hand to the back of his head and felt pain in his hand. He looked at his hand and saw "a whole bunch of blood was coming out." He realized he had been stabbed, but he had not seen the assailant because the person came from behind him.

Nathan Mendoza was another patron at the bar that night. He did not know Gallegos, but he saw the tattoos on the back of Gallegos's head and thought Gallegos was connected to a gang. Mendoza testified that he saw a man "creep up" behind Gallegos, and "the guy just struck" Gallegos twice in the back of his head. Mendoza testified the suspect was holding a small, sharp object in his hand.

Kekauoha testified that he felt some tension in the bar that night, but there were no fights or assaults. He suddenly saw an unknown male rush behind Gallegos on the dance floor. The assailant raised his arm and "came down the back of

[Gallegos's] head." Gallegos's head jerked forward, and the assailant retracted the blade from Gallegos's head and then ran out of the bar. Gallegos was very disoriented and bleeding from the head.

Kekauoha decided not to immediately stop the suspect because he believed the man still had a knife. Once the suspect left the bar, Kekauoha chased him from a distance. The suspect ran away by himself. After chasing him for a few blocks, Kekauoha broke off the pursuit because he was concerned the man might have a firearm.

**The initial investigation**

Around 11:00 p.m., police officers responded to the bar. Officer Richard Cressall found Gallegos lying on the ground in front of the bar. Several patrons and staff members were trying to help him. Gallegos was taken to the hospital.

Officer Cressall also found Deliliah Echavarria outside the bar, and then drove her to the hospital where Gallegos had been taken. Echavarria told Cressall that "she was with her boyfriend [Gallegos] inside the bar when a group of Hispanic males came up behind him, and one of them with an unknown type instrument stabbed him approximately three to four times in the back of the neck." Echavarria initially said that she did not recognize the suspect.

Officer Cressall testified that Echavarria said the suspect's name was "Jesse," and she recognized him from a previous confrontation at the "Blitz" bar, when the man brandished a weapon at her. Echavarria said that about one week later, she was at "Wal–Mart" and saw "Jesse" as he was "driving around the parking lot," and said he gave her "menacing looks."

**Identification of defendant**

The police did not identify a suspect until Detective Luma Fahoum reviewed the bar's security videotape, which depicted the activities of various patrons before, during, and after the stabbing. Fahoum, who previously worked in the gang suppression unit, recognized defendant as the man who stabbed Gallegos. Fahoum knew defendant from prior contacts.

Fahoum testified that the videotape showed defendant had been in the bar with a group of people. Defendant was the only person who walked toward the victim, had an altercation with the victim, and then ran out of the bar.

On January 20, 2010, Detective Lampe showed Shon Kekauoha a photographic lineup which contained defendant's "mug shot." Kekauoha could not identify anyone as the suspect. Kekauoha said he had actually "carded" the suspect at the door when he entered the bar that night and had seen his photo identification.

Later that same day, Detective Lampe prepared another photographic lineup which contained defendant's picture from his driver's license. Kekauoha looked at the second photographic lineup, and identified defendant as the person who stabbed Gallegos.

**Echavarria's statement**

On January 25, 2010, Detective Lampe interviewed Deliliah Echavarria after she had repeatedly refused to speak to the police or return their telephone calls. She

was staying at a motel in Visalia under a false name. Echavarria said she used the alias because she was afraid that defendant would find her. Echavarria seemed hesitant and nervous about giving a statement to the police, but she was not under the influence of drugs or alcohol.

Echavarria said she had been dating Gallegos since the prior year, and she went out exclusively with him. Echavarria identified defendant from the photographic lineup as the man who stabbed Gallegos. Echavarria said she knew defendant from prior incidents at the Blitz bar and "Walgreens." During the Blitz bar incident, defendant swore at her and pulled something from his waistband, which she believed was a gun.

Detective Lampe asked Echavarria if she was in a gang. She said no. He asked if Gallegos was in a gang. She replied that he would have to talk to Gallegos himself.

**Echavarria's trial testimony**

At trial, Deliliah Echavarria testified as a reluctant prosecution witness.  She initially testified that she had never been to Sports Zone; she was not present when Gallegos was stabbed; she did not know defendant; she never talked to the police about the stabbing; she never accused defendant of bothering her before the stabbing; and she never said defendant stabbed Gallegos. Echavarria testified she could not remember anything because she was "always high."

On further examination, Echavarria eventually admitted that she knew Gallegos, and she was dating him at the time of the stabbing. She also admitted that she was with Gallegos when he was stabbed, but still insisted that she did not know where it happened because she was drunk and high that night.

Echavarria also testified that she knew defendant before she knew Gallegos, and that she previously went out with defendant. Echavarria claimed her previous statements about defendant were false because she did not like defendant. Echavarria testified that she did not know if defendant was in a gang, he never brandished a weapon at her at the Blitz bar, and he never "maddogged" her at "Walgreens" or any other place. Echavarria testified she never identified defendant in a lineup or saw defendant do anything to Gallegos.

**Kekauoha's trial testimony**

At trial, Kekauoha watched the bar's security videotape and testified that it showed that the suspect entered the bar with a person in a white hooded sweatshirt. The suspect was wearing a black shirt. The suspect and his companion walked toward a group of males. They stood and spoke with them. The suspect walked through the crowd to the dance floor. The suspect appeared to reach into his right pocket. The suspect stepped behind Gallegos, while Gallegos faced the opposite direction. The suspect stabbed Gallegos in the back of the head, and then he ran out of the bar. Kekauoha testified that after reviewing the videotape, he was positive that defendant was the person who stabbed Gallegos.

**Evidence about other Nortenos in the bar**

The officers determined that the patrons at the bar that night included Mike Ruiz, Feliz Ruiz, and Alex Cervantez, who were sitting together at a table when the officers arrived to investigate the stabbing; Gilbert Salazar; and Tommy Madrid.

Detective Fahoum testified that based on her prior experience with the gang unit, Mike Ruiz was a Norteno and the brother of Felix Ruiz, who was a high ranking northern gang member in Tulare County. Tommy Madrid was a northern gang member with some "stature." Alex Cervantez was also a northerner.

**Evidence about defendant's possible gang affiliation**

Detective Fahoum testified she knew defendant and his brother from her prior experience in the gang unit. On April 13, 2007, Fahoum participated in a search of defendant's home and seized two firearms from his closet. Fahoum testified that she did not find any gang indicia in defendant's room during the search. When Fahoum found the guns, defendant said he had them because "gang tensions were high" in his neighborhood "on the north side of town." Defendant lived in a predominately northern gang area, but there were also some Asian and southern gangs which conflicted with northerners. Detective Fahoum had never encountered defendant with any gang indicia during her prior contacts with him.

Detective Lampe testified that he booked defendant into jail in connection with this case and asked defendant if he was affiliated with any gang for housing and safety purposes. Defendant initially said, " 'General population is fine.' " Lampe told defendant that he did not want him to be hurt and asked if he "might feel more comfortable being housed with a particular group" for his own safety.
Lampe may have asked defendant if he wanted to be " 'housed north or south?' " In response, defendant said that he "hangs around with the northerners. He would prefer to be put with them." Defendant never acknowledged membership with a northern gang.

**The Prosecution's Gang Expert**

Visalia Police Officer Michael Carsten testified as an expert on the Norteno gang, which had over 300 members and was the predominant criminal street gang in Tulare County. The Nortenos are associated with the Nuestro Familia prison gang and claim the color red and the number 14. The Surenos are rivals and enemies of the Nortenos. The Surenos are associated with the Mexican Mafia prison gang and claim the color blue and the number 13.

Officer Carsten testified that tattoos which are common among Nortenos include city names or area codes and stars which represent "the northern star." A five-pointed star "typically symbolizes" a completed mission for the gang. Norteno gang members in Tulare County have also adopted the logo for the Minnesota Twins, which consists of overlapping letters of "T and C." Carsten had seen Norteno gang members wearing belt buckles with the letter "N"; apparel from the Nebraska Cornhuskers, consisting of a red letter "N"; and red apparel from the Cincinnati Reds.

Officer Carsten acknowledged that members of the Norteno gang were not wearing red in Tulare County as frequently as before. Carsten explained that Nortenos and other gang members have learned from their experiences in the court system to downplay their gang affiliations when talking to the police about their association with other gang members, the significance of their clothing and tattoos, and when asked about their affiliations while being booked.

**Primary activities/predicate offenses**

Officer Carsten testified the primary activities of the Norteno street gang in Tulare

County included robbery, carjacking, murder, attempted murder, auto theft, burglary, shooting at inhabited dwellings, witness intimidation, and drug transactions. Carsten had personally investigated vandalisms, robberies, burglaries, carjackings, witness intimation incidents, and auto thefts involving Nortenos.

Officer Carsten explained that one way to get into the Norteno gang was to put in "work" for it, by committing a violent crime or a series of crimes at the gang's direction. A gang member would gain respect and credibility, and rise within the gang, by committing crimes or missions for it, which included attacking or killing a rival gang member, particularly in front of witnesses. A Norteno did not need permission from a higher ranking gang member to kill a Sureno.

Officer Carsten testified about two predicate offenses committed by members of the Norteno gang in Tulare County, but which did not involve defendant. In December 2008, Isaac Sanchez and Daniel Quintano, active members of the Norteno gang, were convicted of armed robbery, with personal use of a firearm and the gang enhancement. The convictions were based on an incident when they confronted a victim and asked if he " 'bang[ed].' " The victim said no, and they robbed him at gunpoint. In May 2007, Richard Contreras and Javier Solis, active members of the Norteno gang, were convicted of, respectully, second degree murder and voluntary manslaughter, with knife and gang enhancements. The convictions were based on an incident where Contreras and Solis confronted two victims and challenged them for being on their block, attacked them with knives, killed one victim, and injured the another person.

**Defendant's gang status**

Officer Carsten testified to his opinion that defendant, also known as "Chewy," was a validated member of the Norteno gang, based on previous contacts with defendant, inmate classification forms, and his tattoos.

Carsten testified that on April 23, 2000, defendant and three other Nortenos assaulted a person because that person was not in their gang. On June 13, 2003, the mother of a Sureno gang member reported that someone was following her car. Defendant was subsequently identified as the person who followed her. When defendant was contacted, he was wearing a belt buckle with the letter "N" on it. Carsten conceded that defendant's middle name was "Navarrete."

Officer Carsten was also aware of the incident in April 2007, when Detective Fahoum searched defendant's house and found two guns, a grenade, and ammunition. Defendant said he had the firearms for protection because of gang tensions in the neighborhood. Carsten thought defendant's reason was significant because "[a] person who has a problem with rival gangs is going to need to arm themselves for protection." On cross-examination, Carsten conceded that there were quite a few people who lived in the north side who had guns to protect themselves in the neighborhood, and not every person was a gang member.

On February 19, 2010, defendant was contacted by police while driving his vehicle with Anthony Cortez, a validated Norteno, and two Norteno associates. The traffic stop was conducted because defendant's car was described as a vehicle involved in an incident where a passenger brandished a gun. When the car was stopped, the officers found that Cortez had a gun in his shoe. Defendant denied being a gang member, and denied any knowledge of the gun.

Officer Carsten also testified about the information which defendant had previously given on inmate classification forms during the booking process. In January 2002, defendant indicated his enemies were "southerners." In May 2006, defendant indicated he did not associate with any criminal street gangs. In July 2007, defendant again stated that he did not associate with any criminal street gangs, but identified "southerners" as enemies for his own safety. In October 2007, defendant indicated he associated with "northern prison or street gangs."

Officer Carsten testified that on January 28, 2010, when defendant was booked into jail on this case, he denied any association with a street gang and asked to be placed in general population. The booking officer asked defendant whether his safety would be in jeopardy if he was placed with southerners. Defendant replied: " 'Okay. Well, put me with northerners.' "

Officer Carsten testified that defendant had a tattoo of a "five-pointed star" on his neck, with a picture of the state of California on top of it, which indicated that he was a Norteno from California. He also had tattoos of "Tulare," "County," and "TC," in black and red ink, on his right arm. The "TC" tattoo was similar to the Minnesota Twins symbol, which has been adopted by Norteno gang members.

Officer Carsten conceded that he did not know whether defendant had served time in prison. Carsten testified that he was not aware that defendant had any prior convictions for gang-related offenses.

Officer Carsten also conceded that defendant was not wearing red clothing on the night of the stabbing. There was no evidence that he had previously been seen in red clothing, or that gang paraphernalia had ever been found at defendant's house. Defendant did not have any tattoos which signified "14" or the Huelga bird.

**Gallegos's gang status**

Officer Carsten testified to his opinion that Benny "Lucky" Gallegos was an active member of the Sureno gang, based on Gallegos's tattoos and prior admissions. On January 24, 2010, after the stabbing, Gallegos told an officer that he was an active BPM Sureno gang member from Corcoran. Carsten testified that he spoke to a former Corcoran police officer who identified BPM as a Sureno gang. He did not know the basis for that officer's opinion about BPM's affiliation.

Officer Carsten admitted that Gallegos claimed that he had left the gang life behind him. On December 21, 2008, Gallegos was a victim of a gang offense, and said he used to be a Sureno. On the night of the stabbing, Gallegos told an officer that he was an inactive Sureno.

However, Officer Carsten testified that Gallegos showed a blue bandana in the bar, and he had Sureno tattoos. Carsten further testified that Gallegos's claimed affinity for San Diego teams, and his "SD" tattoo, represented the Sureno gang territory of Southern California.

**Delilah Echavarria's gang status**

Officer Carsten was aware of Delilah Echavarria's tattoos, including three stars on her neck, but he did not know if she was a Surena. He testified that it was "[n]ot absolutely unheard of" for a Surena to date a Norteno.

**Officer Carsten's testimony about the videotape**

At trial, Officer Carsten narrated the bar's security videotape as it was played for the jury, and identified several people with whom defendant associated before the stabbing. Carsten testified to his opinion that the videotape showed that defendant arrived at the bar with Tommy Madrid. Defendant was wearing a black T-shirt and Madrid was in a white hooded sweatshirt. Madrid was a Norteno of "some stature" because he had served prison time. He also had a "VISA" tattoo on the back of his head, which meant North Side Visalia.

Officer Carsten testified the videotape also showed that Mike Ruiz, Felix Ruiz, and Alex Cervantez were at the bar that night. Detective Fahoum testified Mike Ruiz was a Norteno; Felix Ruiz, his brother, was a high ranking northern gang member in Tulare County; and Alex Cervantez was also a northerner.

Officer Carsten testified that Shon Kekauoha, the security guard, stated that there was a group of people in the bar that he believed to be northern gang members, and the victim had possessed a blue bandana. Nathan Mendoza, a bar patron, said the victim showed off that he was a southern gang member.

Officer Carsten testified videotape showed that defendant and Tommy Madrid stood together at the bar while Madrid spoke to Alex Cervantez. Gilbert Salazar and Alex Cervantez were at the same table and talking with each other. Defendant shook hands with Mike Ruiz as Salazar stood next to them.

Officer Carsten noted that according to a police report, Mike Ruiz said he was at the bar with Cervantez, but he denied knowing Madrid, and he claimed he never spoke to anyone else that night. Carsten testified the videotape refuted Mike Ruiz's claims because it showed Ruiz and Madrid "in close proximity" and engaged in "what appears to be a conversation between the two of them." The videotape also showed Cervantez talking to defendant, Salazar, Mike Ruiz, and Madrid. Cervantez was standing just a few feet away from Gallegos, and he was facing the direction where the stabbing later occurred. The videotape showed Cervantez talking to the man in the red shirt, identified as "Bro."

Officer Carsten testified that Gilbert Salazar later told an officer that "the person he knew as Bro told him there was going to be an attack on a scrap at the bar. His indication was that he did not want to be part of that attack. He also indicated he was a Norteno gang member and said that he was not active at the time." "Bro" was described as "a male adult wearing a red shirt." Carsten testified that Salazar's statement was important because it showed that more than one person knew there was going to be an attack.

Officer Carsten testified about the conduct of "posting up," which meant "standing watch. Guarding." Carsten testified to his belief that videotape showed the man in the red shirt, who was standing next to Cervantez and Madrid, was looking in the general direction of the area where Gallegos was. Carsten believed the man in the red shirt was discussing something with Madrid. At the same time, Cervantez and Salazar were looking in the opposition direction.

Officer Carsten testified to his opinion that the assault on Gallegos was a coordinated attack, based on his review of the security videotape.

> "In viewing the video, the persons that I've identified as Mike Ruiz, Alex Cervantez, [defendant], Tommy Madrid, and Gilbert Salazar, in watching those persons and Mr. Gallegos in the video, when Mr. Gallegos walks into the bar, he is noticed by or appears to be

noticed by Mike Ruiz. And Mike Ruiz goes out of his way to keep an eye on Mr. Gallegos as he walks through the bar. And then there appears to be some sort of communication between Ruiz and the others. And they're back and forth. There is communication between Ruiz and Madrid and Madrid and [defendant], also including Salazar and this other person we know as Bro in the red shirt. Also Alex Cervantez. There is communication between all of them leading up to the incident."

Officer Carsten testified that based on his review of the security videotape, it was his opinion that defendant discussed the assault with Gilbert Salazar. Carsten conceded that he could not be sure about the conversation because there was no sound on the tape. Carsten also conceded that he did not have any information that defendant previously knew the Ruiz brothers, Madrid, or Cervantez prior to the night of the stabbing.

Officer Carsten testified that the videotape showed that the man in the red shirt appeared to walk to the dance floor and move closer to Gallegos. Cervantez appeared to be facing Gallegos's "general direction." Carsten testified that defendant was standing next to Madrid, and they appeared to be discussing something.

Officer Carsten testified the videotape showed that defendant walked to the dance floor, followed by Salazar. Salazar stood next to Cervantez. Defendant reached into his pocket and walked up to Gallegos. Defendant's hand went up and down toward Gallegos's head as he stabbed him.

Officer Carsten testified the videotape showed that Tommy Madrid moved to a different location in the bar, away from the location of the assault, when defendant stabbed Gallegos. Carsten testified it was "tough to say what exactly he could see from that vantage point from the video, but it does appear that there is a surrounding-type of the victim."

On cross-examination, Officer Carsten testified that he did not have any evidence that defendant bragged about the stabbing of Gallegos. Carsten also conceded that there was no evidence as to exactly what defendant and the other men were talking about when they were seen together on the videotape, and no witnesses overheard their conversation.

Officer Carsten testified to his opinion that defendant's attack on Gallegos, as depicted in the video, could have gotten him into the Norteno gang based on his commission of that crime. Carsten conceded there was no evidence whether defendant or his associates knew Gallegos, whether Gallegos was affiliated with a gang, or they saw Gallegos with the bandana. However, defendant would not have to know that Gallegos was a Sureno if he had been directed to perform the assault by another gang member. Carsten conceded that he did not have any evidence that defendant received direction from anyone to attack Gallegos, but believed the videotape showed some nonverbal communications.

"When Mr. Gallegos enters the bar, Mike Ruiz pays very close attention to that. As a matter of fact, he watches him very closely as he enters the bar. And then throughout the course of the video, you can see as the male in the red shirt known as Bro is standing in close proximity with Mr. Gallegos, as is Mr. Cervantez, as is Gilbert Salazar."

10

Officer Carsten believed that Mike Ruiz's actions showed him doing "more than just looking at somebody," and that he "followed" Gallegos and watched him "very closely," although Ruiz did not gesture or point at Gallegos.

Officer Carsten conceded that he did not know whether any of these actions were communicated to defendant, or what defendant discussed with Ruiz, Salazar, and/or Madrid. In his expert opinion, however, he believed the videotape showed that defendant, Mike Ruiz, Salazar, and Tommy Madrid were looking at Gallegos and talking about him.

Officer Carsten conceded that the videotape did not show Gallegos flashing the bandana at any time. However, both Shon Kekauoha and Nathan Mendoza stated that they saw Gallegos flashing the bandana inside the bar.

**Hypothetical questions**

The prosecutor asked Officer Carsten about the following hypothetical question:

> "Let's say an individual goes into a place with another high ranking Norteno gang member, meets up with some other Nortenos in that bar, and other members of that group go back and forth posting up close to a Sureno gang member, and after these individuals go back and forth and communicate with each other, then the person that came into the establishment with that high ranking individual then goes over to that Sureno and stabs him in the neck four times with a blade-type instrument...."

Officer Carsten testified that in his opinion, the crime would have been committed for the benefit of the Norteno gang because "it is an attack against a rival gang member. It's a long time rivalry between Nortenos and Surenos. This is one more attack in an attempt to take out, disable, or at least injure a rival gang member." Carsten further testified the crime would have been committed in association with the Norteno gang based "on persons present with the assailant prior to the act occurring."

Officer Carsten testified the offense would further the Norteno gang because of "the rivalry between Nortenos and Surenos. It's a struggle for power. It's a show of dominance. It is a direct attack against the rival. It promotes the gang. It spreads fear into other people and let's them know that Norteno gangs and Sureno gang, one, are rivals, and, two, are willing to use deadly force when they attack one another." The offense also would have promoted the Norteno gang because Nortenos discuss and brag about their crimes with each other, and the assailant's status would be elevated within the gang. "That he's willing to attack a rival gang member in front of ... a group of people, not caring about himself, but ... caring more about attacking that gang member." There was "no question" about the significance of "a public display" of committing a crime in front of other gang members.

Officer Carsten was asked about a hypothetical situation involving a former girlfriend:

> "Q. And in your expert opinion, what would be the reaction of a Norteno if he was to lose his girl to a Sureno?

"A. In my opinion, he'd be upset and he would want to exact some sort of revenge."

Officer Carsten further explained that "[i]f that person was a rival gang member, that goes even farther to say that that person would need to be punished." The other gang members would react by standing up for their fellow gang member, if the girl was dating a rival gang member.

**Cross-examination; hypothetical questions**

On cross-examination, defense counsel asked Officer Carsten whether a person would be a Norteno if that person went out and had "a couple beers with a guy that happens to be an old school chum" who was a Norteno. Carsten replied that the person would not be a Norteno without more information.

Defense counsel also posed a hypothetical question as to whether an assault would constitute a public display of violence to promote the gang:

"Q. Well, person beats up another person on their own, how is that promoting the street gang? Let me put some other factors involved. The person has no gang attire on, the person has no readily apparent gang tattoos, uses no gang epithets, and says no—gives no indication as to what the motivation for the assault is, how is that for the benefit of a street gang?

"A. That by itself with no other information, no previous history of that person, no associations with that person, I can't say that it is or it isn't."

Defense counsel asked about Echavarria's statements about her prior dating relationship with defendant.

"Q.... Isn't it just as possible that the motivation for this particular assault was jealousy based on the factors you have in front of you?"

"A. I won't say it's impossible, but that's not my opinion."

"Q. And it's further substantiated as a possibility based on the lack of factors from [defendant]; no gang clothing, no gang epithets, no apparent gang motivation, is that correct?"

"A. No, I can't say that. There is certainly gang association. There is certainly gang-related tattoos. There is certainly previous contacts with gang members. That's what I use to formulate my opinion."

Officer Carsten further conceded that when defendant looked in a particular direction, he could not testify from the videotape whether he was looking at Gallegos or "the woman that he dated."

**Defendant's Trial Testimony**

Defendant's trial testimony was the only defense evidence presented. Defendant

12

denied being a member of any gang, but the Nortenos were the primary gang at every place he had lived.

Defendant admitted that he had previously been to prison for possession of narcotics and firearms which were found in his house. He had the guns to protect his family and children because members of the Oriental Troops Asian gang lived near him and occasionally jumped his fence when running through the neighborhood. Defendant denied having the guns because of any connection with the Nortenos, or to protect himself from Surenos.

Defendant admitted that the police stopped his car in February 2010, and that passenger Anthony Cortez had a gun. Defendant had been giving a ride to Lynette Barba when she asked defendant if Cortez and another man could also get a ride. Defendant explained that he did not know Cortez, that Cortez was a Norteno, or that he had a gun.

Defendant testified that his tattoos were not gang-related, and he did not have any Norteno or "14" tattoos. The "Tulare County" tattoo represented Tulare County, and the "TC" tattoo was for the Minnesota Twins. Defendant admitted he got the "TC" tattoo while he was in prison. Defendant claimed he was a fan of the Twins, and knew that Kirby Puckett had played for the farm club in Visalia. Defendant testified he designed the star and California tattoos on his neck, which meant "California porn star," as a joke among his girlfriends.

Defendant further testified he did not wear red clothing or hats, and did not have any apparel with the "TC" design. He usually wore dark colors like black and gray. His "N" belt buckle stood for his middle name. He denied that his nickname was "Chewy."

Defendant testified that he had never told any jail intake officers that he was a member of a gang. Defendant admitted that he would "hang out" with people who he felt comfortable with, and they might have been gang members. He denied doing anything to make Surenos angry at him. Defendant admitted that he had listed "southerners" as his enemies in jail: "Well, I mean, if you run into them in jail, then what are you going to do? You're going to get hurt, right?" He thought that southerners would think that he was a Norteno because he socialized with them in high school.

**Defendant and Echavarria**

Defendant testified that he met Deliliah Echavarria when she worked as a stripper at a private party in August 2009. They started dating, and he thought they were in an exclusive relationship, although defendant was married to another woman.

Defendant testified they broke up because Echavarria was jealous that he had other girlfriends. Defendant testified that he saw Echavarria at the Blitz bar, when he was there with a couple of girlfriends. Echavarria became "a little hostile" toward him, and called the girls various names. The bar's bouncers threw her out. Defendant denied brandishing a weapon during that incident. Defendant testified he later saw Echavarria at Walgreens while he was with two other girlfriends. Echavarria "flipped [him] off" and was hostile toward the girls.

**The night of the stabbing**

Defendant testified that he worked for an almond warehouse and carried a box

13

cutter for his work. On the day of the stabbing, he finished work and went to a friend's house. Defendant and his friend split a 12–pack of beer. Defendant left the friend's house and went to the Sports Zone bar by himself.

Defendant testified he did not enter the bar with Tommy Madrid. Defendant initially testified he did not know Tommy Madrid, but then admitted he knew him from high school. Defendant had worked as a bouncer at different bars, and also recognized Madrid from seeing him at those bars. Defendant testified he knew Madrid enough to say hello to him. Defendant knew Madrid used to hang around with gang members in high school, but he did not know if he was a gang member because they never talked about it.

Defendant testified he followed Madrid to the bar, where he shook hands with a couple of guys, shook hands with Madrid, and bought a beer for Madrid and a drink for himself. Madrid introduced him to several people. The music was very loud, and defendant did not hear their names or anything Madrid said about them. Based on his prior experience working at other bars, defendant recognized Felix and Mike Ruiz, Alex Cervantez, and Gilbert Salazar, but he did not know their names and did not know if they were gang members. Defendant, Madrid and the other men did not discuss Gallegos, or whether Gallegos had engaged in any type of gang-related activity.

**The stabbing**

Defendant testified that as soon as he entered the bar, he saw Echavarria dancing with a man, later identified as Gallegos. Defendant testified that he felt upset, angry, and shocked. Defendant did not know or recognize Gallegos; he did not see Gallegos holding a blue rag; he did not see any Sureno tattoos on Gallegos; and he did not know or care if he was a Sureno.

Defendant testified that while he was standing with Madrid, he kept looking at Echavarria. He became upset about the way she was dancing with the other man, and that was "building up my anger. That's the only thing that was on my mind was watching her dance on this other man."

Defendant testified he did not talk to Madrid or the other men to plan the assault on Gallegos. However, defendant admitted that he told the other men that a man was " 'with my girl,' " and he was " 'going to kick his ass.' " Defendant might have told the man in the red shirt the same thing. Defendant admitted that the videotape showed him talking with Tommy Madrid just before the stabbing. Defendant testified that he might have told Madrid that he was going to leave.

Defendant testified that he walked toward Echavarria and Gallegos. He still had his box cutter from work, took it out of his pocket, and opened the six-inch blade. "After seeing what she was doing, she was dancing on him, I just lost it."

Defendant testified that he walked behind Gallegos, "acted out," and stabbed Gallegos in the back of his head and neck. He stabbed Gallegos because he felt too drunk to fight him, and he thought the stabbing was "the best way" to hurt him. Defendant testified he did not intend to kill Gallegos. "All I wanted to do was hurt him because she was hurting me, and I was mad." Defendant would have sliced Gallegos's throat if he had wanted to kill him. Defendant did not assault Echavarria because "I'm not going to touch a woman. I'm not going to put hands on a woman."

**Verdict**

Defendant was convicted of attempted premeditated murder, with special allegations that he personally used a deadly or dangerous weapon in the commission of the offense; he inflicted great bodily injury on the victim, and he committed the offense for the benefit of a criminal street gang (§ 186.22, subd. (b)(1)(C)).

## III.

## LEGAL STANDARD FOR REVIEW

Relief by way of a petition for writ of habeas corpus extends to a person in custody pursuant to the judgment of a state court if the custody is in violation of the Constitution or laws or treaties of the United States. 28 U.S.C. § 2254(a); 28 U.S.C. § 2241(c)(3); Williams v. Taylor, 529 U.S. 362, 375, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000). Petitioner asserts that he suffered violations of his rights as guaranteed by the U.S. Constitution. The challenged conviction arises out of Fresno County Superior Court, which is located within the venue of this Court. 28 U.S.C. § 2254(a); 28 U.S.C. § 2241(d).

On April 24, 1996, Congress enacted the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), which applies to all petitions for writ of habeas corpus filed after its enactment. Lindh v. Murphy, 521 U.S. 320, 117 S.Ct. 2059, 138 L.Ed.2d 481 (1997); Jeffries v. Wood, 114 F.3d 1484, 1499 (9th Cir. 1997) (en banc). The instant petition was filed after the enactment of the AEDPA and is therefore governed by its provisions.

Under the AEDPA, relitigation of any claim adjudicated on the merits in state court is barred unless a petitioner can show that the state court's adjudication of his claim:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d); Harrington v. Richter, 562 U.S. 86, 97-98, 131 S.Ct. 770, 178 L.Ed.2d 624 (2011); Lockyer v. Andrade, 538 U.S. 63, 70-71, 123 S.Ct. 1166, 155 L.Ed.2d 144 (2003); Williams, 529 U.S. at 413.

As a threshold matter for the first exception for habeas relief, this Court must "first decide what constitutes 'clearly established Federal law, as determined by the Supreme Court of the United States.'" Lockyer, 538 U.S. at 71 (quoting 28 U.S.C. § 2254(d)(1)).  In ascertaining what is "clearly established Federal law," this Court must look to the "holdings, as opposed to the dicta, of [the Supreme Court's] decisions as of the time of the relevant state-court decision." Williams, 592 U.S. at 412.  "In other words, 'clearly established Federal law' under § 2254(d)(1) is the governing legal principle or principles set forth by the Supreme Court at the time the state court renders its decision." Id.  In addition, the Supreme Court decision must "'squarely address [] the issue in th[e] case' or establish a legal principle that 'clearly extend[s]' to a new context to the extent required by the Supreme Court in . . . recent decisions"; otherwise, there is no clearly established Federal law for purposes of review under the AEDPA.  Moses v. Payne, 555 F.3d 742, 754 (9th Cir. 2009) (quoting Wright v. Van Patten, 552 U.S. 120, 128 S.Ct. 743, 169 L.Ed.2d 583 (2008)); Panetti v. Quarterman, 551 U.S. 930, 127 S.Ct. 2842, 168 L.Ed.2d 662 (2007); Carey v. Musladin, 549 U.S. 70, 127 S.Ct. 649, 166 L.Ed.2d 482 (2006).  If no clearly established Federal law exists, the inquiry is at an end and the Court must defer to the state court's decision.  Carey, 549 U.S. at 77; Wright, 552 U.S. at 126; Moses, 555 F.3d at 760.

If the Court determines there is governing clearly established Federal law, the Court must then consider whether the state court's decision was "contrary to, or involved an unreasonable application of," [the] clearly established Federal law."  Lockyer, 538 U.S. at 72 (quoting 28 U.S.C. § 2254(d)(1)).  "Under the 'contrary to' clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the] Court has on a set of materially indistinguishable facts."  Williams, 529 U.S. at 412-13; see also Lockyer, 538 U.S. at 72.  "The word 'contrary' is commonly understood to mean 'diametrically different,' 'opposite in character or nature,' or 'mutually opposed.'"  Williams, 529 U.S. at 405 (quoting Webster's Third New International Dictionary 495 (1976)).  "A state-court decision will certainly be contrary to [Supreme Court] clearly established precedent if the state court applies a rule that contradicts the governing law set forth in [Supreme Court] cases."  Id.  If the state court decision

1  is "contrary to" clearly established Supreme Court precedent, the state decision is reviewed

2  under the pre-AEDPA de novo standard.  Frantz v. Hazey, 533 F.3d 724, 735 (9th Cir. 2008) (en

3  banc).

4       "Under the 'reasonable application clause,' a federal habeas court may grant the writ if

5  the state court identifies the correct governing legal principle from [the] Court's decisions but

6  unreasonably applies that principle to the facts of the prisoner's case."  Williams, 529 U.S. at

7  413.  "[A] federal court may not issue the writ simply because the court concludes in its

8  independent judgment that the relevant state court decision applied clearly established federal

9  law erroneously or incorrectly.  Rather, that application must also be unreasonable."  Id. at 411;

10 see also Lockyer, 538 U.S. at 75-76.  The writ may issue only "where there is no possibility fair

11 minded jurists could disagree that the state court's decision conflicts with [the Supreme Court's]

12 precedents."  Richter, 562 U.S. at 102.  In other words, so long as fair minded jurists could

13 disagree on the correctness of the state courts decision, the decision cannot be considered

14 unreasonable.  Id.  If the Court determines that the state court decision is objectively

15 unreasonable, and the error is not structural, habeas relief is nonetheless unavailable unless the

16 error had a substantial and injurious effect on the verdict.  Brecht v. Abrahamson, 507 U.S. 619,

17 637, 113 S.Ct. 1710, 123 L.Ed.2d 353 (1993).

18      For the second exception for federal habeas relief, a petitioner must show that the state

19 court result "was based on an unreasonable determination of the facts in light of the evidence

20 presented in the State court proceeding."  28 U.S.C. § 2254(d)(2).  The AEDPA requires

21 considerable deference to the state courts.  "Factual determinations by state courts are presumed

22 correct absent clear and convincing evidence to the contrary."  Miller-El v. Cockrell, 537 U.S.

23 322, 340, 123 S.Ct. 1029, 154 L.Ed.2d 931 (2003) (citing 28 U.S.C. § 2254(e)(1)).  The question

24 under the AEDPA is not whether a federal court believes the state court's determination was

25 incorrect but whether that determination was unreasonable—a substantially higher threshold."

26 Schriro v. Landrigan, 550 U.S. 465, 473–74, 127 S.Ct. 1933, 167 L.Ed.2d 836 (2007).

27      In deciding whether relief from an unconstitutional trial error is warranted, federal courts

28 apply the standard from Brecht v. Abrahamson, 507 U.S. 619, 623, 113 S.Ct. 1710, 123 L.Ed.2d

353 (1993) "uniformly in all federal habeas corpus cases under § 2254," that is, the error must have had "a substantial and injurious effect or influence in determining the jury's verdict." Bains v. Cambra, 204 F.3d 964, 977 (9th Cir.2000).

The court looks to the last reasoned state court decision as the basis for the state court judgment. Stanley v. Cullen, 633 F.3d 852, 859 (9th Cir. 2011); Robinson v. Ignacio, 360 F.3d 1044, 1055 (9th Cir. 2004). If the last reasoned state court decision adopts or substantially incorporates the reasoning from a previous state court decision, this court may consider both decisions to ascertain the reasoning of the last decision. Edwards v. Lamarque, 475 F.3d 1121, 1126 (9th Cir. 2007) (en banc). "When a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary." Richter, 562 U.S. at 99. This presumption may be overcome by a showing "there is reason to think some other explanation for the state court's decision is more likely." Id. at 99-100 (citing Ylst v. Nunnemaker, 501 U.S. 797, 803, 111 S.Ct. 2590, 115 L.Ed.2d 706 (1991)).

Where the state court reaches a decision on the merits but provides no reasoning to support its conclusion, a federal habeas court independently reviews the record to determine whether habeas corpus relief is available under § 2254(d). Stanley, 633 F.3d at 860; Himes v. Thompson, 336 F.3d 848, 853 (9th Cir. 2003). "Independent review of the record is not de novo review of the constitutional issue, but rather, the only method by which we can determine whether a silent state court decision is objectively unreasonable." Himes, 336 F.3d at 853. While the federal court cannot analyze just what the state court did when it issued a summary denial, the federal court must review the state court record to determine whether there was any "reasonable basis for the state court to deny relief." Richter, 562 U.S. at 98. This court "must determine what arguments or theories ... could have supported, the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of [the Supreme] Court." Id. at 102.

\ \ \

\ \ \

# IV.

## REVIEW OF PETITIONER'S CLAIMS

### A.    Trial Court's Denial of Motions for Mistrial and New Trial

Petitioner argues that the trial court erred when it denied his motions for mistrial and new trial after his gang expert, Hurtado, resigned.  Respondent argues that there is no clearly established federal law that a defendant is entitled to an expert witness besides a psychiatrist. Respondent also contends that the California Court of Appeal did not solely rely on the evidence of the videotape when it determined that the trial court did not erroneously deny the motion for a mistrial and the motion for a new trial.

### 1.    Fifth District Court of Appeal's Decision

This claim was presented on direct appeal to the Fifth District Court of Appeal and it was denied in a reasoned decision.  (LD 4).  Petitioner then presented this claim in a petition for review to the California Supreme Court.  The California Supreme Court summarily denied the petition.  (LD 7).  Federal courts review the last reasoned state court opinion.  Ylst, 501 U.S. at 803.  Therefore, the Court must review the opinion of the Fifth District Court of Appeal.  (LD 4). In rejecting Petitioner's claim, the Fifth District Court of Appeal stated as follows:

### I.    Denial of defendant's motions for new trial; legal error

Based on the procedural history set forth ante, defendant contends the court abused its discretion when it denied his motion for new trial based on the resignation of the defense expert, Hurtado. Defendant argues the court should have granted a new trial based on an alleged error of law when it denied his motion for mistrial, and for the ineffective assistance of his defense counsel which led to the resignation of his defense gang expert.

Defendant contends the court's denial of his new trial motion resulted in the violation of his constitutional rights to due process, a fair trial, and effective assistance of counsel. Defendant further argues that the constitutional violations were prejudicial because the jury only heard testimony from the prosecution's expert, Officer Carsten, about his interpretation of defendant's possible gang status and defendant's conduct as depicted on the surveillance videotape. Defendant asserts that the court's refusal to grant a mistrial or a continuance prevented the jury from hearing the contrary opinions from a defense gang expert that the evidence showed he attacked Gallegos because of his anger about Echavarria and his heat of passion; he did not intend to murder Gallegos; he was not a member of the Nortenos; he did not discuss

the stabbing with other Norteno members at the bar; and he did not commit the stabbing to benefit the Nortenos.

In this section, we will review whether the court properly denied defendant's motion for a new trial based on the allegation that the court committed an error of law when it denied his motion for mistrial. In issue II, we will review the court's denial of defendant's new trial motion based on the alleged violation of his right to effective assistance of counsel.

**A. Motion for new trial**

A motion for new trial may be granted when the court has "erred in the decision of any question of law arising during the course of the trial ...." (§ 1181, subd. 5.) "A trial court's ruling on a motion for new trial is so completely within that court's discretion that a reviewing court will not disturb the ruling absent a manifest and unmistakable abuse of that discretion. [Citation.]" (People v. Hayes (1999) 21 Cal.4th 1211, 1260–1261.) This standard of review is deferential but "it is not empty.... [I]t asks in substance whether the ruling in question 'falls outside the bounds of reason' under the applicable law and the relevant facts [citations]." (People v. Williams (1998) 17 Cal.4th 148, 162.)

**B. The court's denial of defendant's motion for mistrial**

Defendant contends the court should have granted his posttrial motion for new trial because it committed an error of law when it denied his midtrial motion for mistrial. We must thus review the court's denial of his motion for mistrial.

"A trial court should grant a mistrial only when a party's chances of receiving a fair trial have been irreparably damaged, ..." (People v. Bolden (2002) 29 Cal.4th 515, 555.) "Whether a particular incident is incurably prejudicial requires a nuanced, fact-based analysis. The trial court is entrusted with broad discretion in ruling on mistrial motions. [Citation.]" (People v. Chatman (2006) 38 Cal.4th 344, 369–370.)

"We review a trial court's order denying a motion for mistrial under the deferential abuse of discretion standard. [Citation.] 'Under this standard, a trial court's ruling will not be disturbed, and reversal of the judgment is not required, unless the court exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice.' [Citation.]" (People v. Dunn (2012) 205 Cal.App.4th 1086, 1094 (Dunn ).)

**C. Carrillo**

In the instant case, defendant brought a motion for mistrial while the prosecution was presenting its case, and immediately upon notifying the court that Hurtado, the defense expert, had resigned and would not appear at trial. Defense counsel argued the court should grant a mistrial because defendant could not receive a fair trial without the testimony of a defense expert. The trial court

denied the motion based on Carrillo v. Superior Court, supra, 145 Cal.App.4th 1511, stating that Carrillo held that it was " 'an extremely rare event' " to grant a mistrial because of the perceived ineffectiveness of defense counsel, and that " 'a far safer practice' " was for the court to intervene " 'only in ruling on posttrial motions following a conviction, if indeed a conviction occurs. It is unwise for a judge to declare a mistrial due to counsel's alleged ineffectiveness because it's a chancy business to predict a verdict a jury may have returned in this case.' " (RT 338–339)

The trial court's reliance on Carrillo in this case was misplaced. Carrillo involved a complex situation triggered by a trial court's decision to grant a mistrial on its own motion, and without the defendant's consent, based on its belief that the defense counsel in that case was prejudicially ineffective because he allowed the jury to hear evidence about a coerced confession. The trial court discharged the jury without the defendant's consent, and over defense counsel's repeated objections that he had valid tactical reasons for his trial strategy. When the prosecution tried to retry the defendant, he argued that principles of double jeopardy barred retrial because the court discharged the jury without his consent. (Carrillo, supra, 145 Cal.App.4th at pp. 1520–1522, 1524, 1528.)

Carrillo agreed and held that in such circumstances, a defendant could not be retried if he did not consent to the mistrial and the discharge of the jury, unless the trial court's decision had been based on "legal necessity." (Carrillo, supra, 145 Cal.App.4th at pp. 1523–1524.) Carrillo focused on three cases which "held that ineffective assistance of counsel may, in extreme circumstances, constitute legal necessity for a mistrial. (People v. Manson (1976) 61 Cal.App.3d 102 ... ; People v. McNally (1980) 107 Cal.App.3d 387 ... ; People v. Coleman (1992) 9 Cal.App.4th 493....)" (Carrillo, supra, 145 Cal.App.4th at p. 1525, italics added.)

> "Where, as here, a trial court becomes convinced that defense tactics are denying a defendant a fair trial, the proper course of action, in the absence of the type of extreme circumstances described in Manson, McNally and Coleman, is to allow the case to proceed to judgment and then consider whether the defendant is entitled to a new trial. [Citations.] This is what should have occurred in this case. Once [defense counsel] became aware of the trial court's willingness to declare a mistrial, the decision as to the extent of the prejudice allegedly caused by [defense counsel's] decision to introduce [defendant's] confession was for [defendant] and his counsel. [Citation.] The trial court's decision to declare a mistrial stripped [defendant] of his right to maintain primary control over his trial and may well have compromised his effort to prove his innocence." (Carrillo, supra, 145 Cal.App.4th at p. 1529, italics added.)[29]

Carrillo concluded that there was no "legal necessity" for the trial court's sua sponte declaration of a mistrial and discharge of the

21

jury without the defendant's consent and, as a result, the defendant could not be retried. (Carrillo, supra, 145 Cal.App.4th at p. 1529.)

### 1.   Analysis

As applied to the instant case, the trial court improperly relied on Carrillo when it denied defendant's motion for mistrial and held that the matter should be deferred until after the verdict. Carrillo did not hold that a trial court could never grant a motion for mistrial based on ineffective assistance in the absence of "legal necessity" or "extreme circumstances," or that such motions should always be deferred until the conclusion of the trial. (Carrillo, supra, 145 Cal.App.4th at p. 1529.) Instead, Carrillo addressed a far more complex situation involving the definition of legal necessity for granting a mistrial motion and discharging the jury without a defendant's consent, and whether such orders implicated principles of double jeopardy and barred retrial. Carrillo was particularly critical of the trial court's failure in that case to realize that defense counsel's tactical decision about the coerced confession would not have constituted ineffective assistance if the defendant expressly agreed with the decision, the court's failure to determine whether the defendant and defense counsel had discussed this strategic decision, and whether the defendant expressly waived his right to exclude the coerced confession. (Ibid.)

In contrast to Carrillo, defense counsel in this case expressly moved for a mistrial based on the sudden resignation of Hurtado, the defense gang expert, in the middle of trial. If the court had granted the mistrial motion, it would have been with defendant's consent to discharge the jury, and defendant could have been retried without determining whether the mistrial motion was properly based on "legal necessity." (See, e.g., Carrillo, supra, 145 Cal.App.4th at p. 1528.) The trial court in this case incorrectly asserted that Carrillo limited consideration of motions for mistrial based on ineffective assistance, and the better practice was to defer the legal issues until there was a verdict.

We note that Carrillo criticized the trial court in that case for failing to determine whether the defendant consented to his defense attorney's tactical decisions, which would have eliminated the ineffective assistance concerns. In this case, the trial court apparently failed to evaluate whether there were any alternatives to defendant's motion for a mistrial, or whether it could address the situation without waiting for the verdict.

### D. Dunn

While the court's reliance on Carrillo may have been misplaced, that does not mean that it necessarily abused its discretion when it denied defendant's motions for new trial and mistrial.

A situation very similar to the instant case was addressed in Dunn, supra, 205 Cal.App.4th 1086, where the trial court denied a motion for mistrial after the defense expert failed to appear. In that case,

the defendant was charged with the sexual molestation of a child. Near the end of the prosecution's case, defense counsel advised the court that his retained expert witness was unavailable to testify because of scheduling conflicts; the witness had not been subpoenaed and would not appear; and he could not find a substitute. Defense counsel had expected the retained expert to testify about whether there was physical evidence that the defendant performed an alleged sexual act on the victim. (Id. at pp. 1093–1094, 1095.)

Dunn extensively discussed how to review whether a mistrial should be granted "when an expert witness retained by the moving party (or any other witness expected to testify on behalf of the moving party) unexpectedly becomes unavailable or otherwise does not appear at trial." (Dunn, supra, 205 Cal.App.4th at p. 1094, fn. omitted.) Dunn compared the situation to those addressed in motions for new trial, which "should be granted when necessary 'to insure an accused a fair trial.' [Citation.]" (Id. at p. 1095.)

Dunn held the following four factors should be considered to determine whether the court should have granted the defendant's motion for mistrial based on the unavailability of the expert witness:

> "(1) [T]he defendant's diligence in securing the attendance of the witness [citations]; (2) the defendant's use of available alternative means to obtain the desired evidence [citations]; (3) the defendant's fault for the witness's nonappearance [citations]; and (4) the nature of the testimony expected from the witness and its probable effect on the outcome of the trial [citations]." (Dunn, supra, 205 Cal.App.4th at p. 1095.)

Dunn held the trial court did not abuse its discretion based on these factors. First, while the defendant did not subpoena the expert, Dunn acknowledged it was not customary for a party to subpoena his own retained expert witness, and this factor was not particularly relevant to the situation. (Dunn, supra, 205 Cal.App.4th at p. 1096.) Second, the defendant did not use "available alternative means" to obtain the expert's testimony. (Ibid.) "He did not request a continuance of the trial, present a declaration from or offer to depose [the expert], or seek a stipulation from the People as to [the expert's] credentials or the substance of her expected testimony that could be read to the jury." (Ibid.) Dunn held that the defendant's "failure to at least explore these options" supported the court's denial of his mistrial motion. (Ibid.)

Dunn held that as to the third factor, the defendant was "not entirely free from fault" regarding the expert's inability to testify. (Dunn, supra, 205 Cal.App.4th at p. 1096.)

> "... [Defense counsel] knew before trial commenced that [the expert] was scheduled to leave for vacation near the time of trial. He therefore should have communicated more effectively with her and made

> more definitive arrangements to secure her appearance at trial. Although ordinarily that would not include service of a subpoena on [the expert] because she was a retained expert witness, the combination of counsel's inability to contact her during trial and her potential unavailability suggested the need for a subpoena." (Id. at p. 1096.)

Dunn held that the fourth factor was the most important because the expert's expected testimony "would not have changed the result of the trial." (Dunn, supra, 205 Cal.App.4th at p. 1096.) The defense expert was expected to testify that there was no physical evidence that the victim's vagina was penetrated. However, Dunn noted that the charged offense did not require penetration of the victim's vagina. (Id. at pp. 1096–1098.) "Nothing in [the expert's] expected testimony could have had any impact on the controlling law the jury had to apply. [Citation.]" (Id. at p. 1098.)

> "Thus, because [the expert's] expected testimony concerning penetration would not have contradicted [the prosecution expert's] testimony or negated the People's legally sufficient theory of the case, [the expert's] testimony would not have affected the result of the trial, a factor further supporting the trial court's denial of [the] mistrial motion. [Citations.]" (Ibid., fn. omitted.)

Dunn also addressed the defendant's argument that his due process rights were violated in the absence of the defense expert's testimony, because " 'the "battle of the experts" and the reasonable inferences therefrom created the realistic possibility' of a better outcome for him at trial," since the defense expert's expected opinion would have differed from the prosecution's expert about the nature of the victim's physical injuries. (Dunn, supra, 205 Cal.App.4th at p. 1099.) Dunn rejected these arguments and held there was no factual foundation to support the defendant's claim because defense counsel "conceded he had not discussed" these particular issues with the defense expert. Defense counsel "simply advised" the court "of his intention " to ask the expert about this topic. (Ibid., italics added.)

> "In sum, all of the factors enumerated above ..., except the due diligence factor to which we attribute little weight ..., support the trial court's denial of [defendant's] motion for mistrial. We therefore conclude the absence of [the defense expert's] testimony did not irreparably damage [defendant's] chances of receiving a fair trial, and the court did not abuse its discretion in denying the motion. [Citation.]" (Id. at pp. 1099–1100.)

Finally, Dunn concluded that even if the trial court erroneously denied defendant's motion for mistrial, based on the expert's failure to appear, the error was harmless under either Chapman v. California (1967) 386 U.S. 18 or People v. Watson (1956) 46

Cal.2d 818, because the evidence of defendant's guilt, " 'though [partially] circumstantial, was tight and strong.' [Citation.]" (Dunn, supra, 205 Cal.App.4th at p. 1100.) The victim offered a detailed account of the sexual molestation, several witnesses corroborated various aspects of the sexual assault because they heard the victim tell the defendant to get off of her, the victim subsequently developed a sexually transmitted disease, and defendant tested positive for that same disease. (Ibid.)

### 1. Analysis

We now apply Dunn 's analysis to the court's denial of defendant's motion for mistrial based on Hurtado's resignation as the defense expert. Based on the first factor, defense counsel exercised diligence in this case because he retained Hurtado just after the information was filed and obtained an order for Hurtado to interview defendant in jail. As in Dunn, defense counsel did not subpoena Hurtado, but Dunn noted that it was not customary for a party to subpoena his own witnesses. (Dunn, supra, 205 Cal.App.4th at p. 1096.)

An analysis of the second factor weighs against defendant because he did not even attempt to use available alternative means to somehow secure Hurtado's testimony. As in Dunn, defendant did not offer to depose the expert in order to obtain his testimony. More importantly, however, defendant did not request a continuance and refused the court's offer of a short continuance to determine whether he could convince Hurtado to return, or investigate possible alternatives to Hurtado's appearance. Defendant's failure to "at least explore these options" supported the court's denial of his mistrial motion. (Dunn, supra, 205 Cal.App.4th at p. 1096.)

An analysis of Dunn 's third factor—the defendant's fault for the witness's nonappearance—also weighs against defendant. As in Dunn, defendant was "not entirely free from fault" for Hurtado's resignation from the case. (Dunn, supra, 205 Cal.App.4th at p. 1096.) Defense counsel was aware that Hurtado had potential scheduling problems with the December trial because of his academic schedule. More importantly, defendant was aware of Hurtado's anger about various aspects of the case based on Hurtado's e-mail of December 9, 2010. Hurtado accused defense counsel of not protecting his interests. He was upset that he had to produce a written report for discovery so close to trial, that the prosecution was challenging his credibility as an expert, and that he had to appear at an evidentiary hearing for the court to determine whether he could testify as an expert.

Based on the instant record, however, the prosecution was not engaging in improper tactics when it asked the defense to comply with discovery and produce a report from the expert, or when it requested a hearing on the witness's qualifications as a potential gang expert. Indeed, defense counsel could have requested the same type of hearing or conducted voir dire on Officer Carsten's qualifications as a gang expert. (See, e.g., Evid.Code, §§ 405, 720;

People v. Watson (2008) 43 Cal.4th 652, 692; People v. Hill (2011) 191 Cal.App.4th 1104, 1120–1123; People v. Brown (2001) 96 Cal.App.4th Supp. 1, 36.) The record strongly implies that defense counsel did not explain this matter to Hurtado, or Hurtado erroneously believed that the court lacked jurisdiction to determine if he qualified as a gang expert. Defense counsel was aware of Hurtado's reaction as of December 9, 2010, based on the e-mail that he received with the report. The combination of counsel's conflicts with Hurtado and his potential unavailability during a December trial "suggested the need for a subpoena." (Dunn, supra, 205 Cal.App.4th at p. 1096.)

Dunn 's fourth factor as to whether the mistrial should have been granted is based on "the nature of the testimony expected from the witness and its probable effect on the outcome of the trial [citations]." (Dunn, supra, 205 Cal.App.4th at p. 1095.) When defendant moved for the mistrial in this case, it was difficult for the trial court to evaluate the nature of the testimony that Hurtado would have offered. Hurtado's belated discovery report was limited to the conflicting evidence about whether defendant was a member of the Norteno gang. Hurtado's report did not address the surveillance videotape, whether the videotape showed that defendant was in the bar with the other Norteno gang members, whether it showed that the other gang members were watching Gallegos, and whether defendant stabbed the victim because he was dancing with Echavarria. Hurtado's report also failed to address any aspects of the charged offense of attempted murder and defendant's motive.

Defendant argued that the trial court should grant a mistrial because there would be no defense expert to counter Officer Carsten's expert testimony. Dunn rejected a similar argument that a mistrial should have been granted simply because the lack of a defense expert eliminated the possibility of a "battle of experts" and " 'the reasonable inferences therefrom created the realistic possibility' of a better outcome for him at trial," since the defense expert's expected opinion would have differed from the prosecution's expert about the nature of the victim's physical injuries in that case. (Dunn, supra, 205 Cal.App.4th at p. 1099.) While defendant may have planned to ask Hurtado about the videotape and other issues not included in his written report, there was no evidence that defendant discussed these particular issues with the defense expert or that the expert had reviewed the videotape, and defense counsel "simply advised" the court "of his intention " to ask the expert about these topics. (Ibid., italics added)

While the trial court erroneously relied on Carrillo when it denied defendant's motion for mistrial, it also made specific findings about the nature of defendant's case at the time of the mistrial ruling.

> "So far, the defense in this case has been 'I didn't do it. It wasn't me.' So far. 'No one can identify me.' There has been attacks on the video and the credibility of whether or not somebody actually can

26

see the defendant do what he's charged with doing. So first off, he's claiming 'I didn't do it,' at least so far. And let alone that, 'I'm not a gang member.' If they find you didn't do it, whether or not there's gang testimony or not, is irrelevant. It doesn't matter."

The court accurately summarized defense counsel's cross-examination of the prosecution's witnesses up to that point. While defense counsel may have requested jury instructions on heat of passion, it was not clear whether defendant or any other witness was going to offer evidence to support the potential theory that the stabbing constituted an attempted voluntary manslaughter performed in the heat of passion and for personal reasons because of the victim's relationship with Echavarria, instead of an attempted murder of a Sureno, committed in a bar frequented by Nortenos, for the benefit of the Norteno gang, or even if defendant's prior relationship with Echavarria contributed to his motive to commit the offense to benefit the gang.

Based on the record before the trial court, we cannot say that it abused its discretion when it denied defendant's motion for mistrial even though it relied on an erroneous interpretation of Carrillo. The court similarly did not abuse its discretion when it denied defendant's motion for new trial based on an alleged error of law when it denied his motion for mistrial.

In reaching this conclusion, we are mindful that a criminal defendant has the due process right to the assistance of expert witnesses, if necessary, to prepare his defense. (Ake v. Oklahoma (1985) 470 U.S. 68, 83 (Ake ); People v. San Nicolas (2004) 34 Cal.4th 614, 661.) "[A] criminal trial is fundamentally unfair if the State proceeds against an indigent defendant without making certain that he has access to the raw materials integral to the building of an effective defense...." (Ake, supra, 470 U.S. at p. 77.) The constitutional right to the effective assistance of counsel has been found to provide additional support for the entitlement to defense experts. (People v. Stuckey (2009) 175 Cal.App.4th 898, 917.) The California Supreme Court has held that "the right to counsel guaranteed by both the federal and state Constitutions includes, and indeed presumes, the right to effective counsel [citations], and thus also includes the right to reasonably necessary ancillary defense services. [Citations.]" (Corenevsky v. Superior Court (1984) 36 Cal.3d 307, 319, fns. omitted (Corenevsky ); Mason v. Arizona (9th Cir.1974) 504 F.2d 1345, 1351.)

As we have explained, however, we cannot say that the court's ruling in this case was prejudicial, based on the nature of the appellate record. The only evidence about the possible expert testimony consisted of Hurtado's rather sparse and belatedly-prepared report for discovery purposes. That report failed to address the crucial issues in this case, particularly whether the surveillance videotape showed that defendant entered the bar and associated with other Norteno members; whether they repeatedly watched the victim's conduct in the bar; and whether defendant

1

2

3

> stabbed the victim because of his alleged anger about Echavarria.
> Thus, given the nature of the appellate record, we cannot find that
> the trial court's denial of both the mistrial and new trial motions
> were prejudicial.

4   (LD 4 at 40-51).

5       2.    <u>Pertinent Law</u>

6       Petitioner argues that he was denied the meaningful opportunity to introduce relevant

7   evidence in his defense, which is a right guaranteed by the Constitution. <u>See</u> <u>Holmes v. South</u>

8   <u>Carolina</u>, 547 U.S. 319, 324, 126 S.Ct. 1727, 164 L.Ed.2d 503 (2006); <u>Crane v. Kentucky</u>, 476

9   U.S. 683, 690, 106 S.Ct. 2142, 90 L.Ed.2d 636 (1986). If the state courts violated a criminal

10   defendant's right to present witnesses or evidence in his defense, federal habeas relief is available

11   only if the defendant demonstrates that the error had a "substantial and injurious effect" upon the

12   verdict. <u>See</u> <u>Brecht v. Abrahamson</u>, 507 U.S. 619, 637–38, 113 S.Ct. 1710, 123 L.Ed.2d 353

13   (1993); <u>Fry v. Pliler</u>, 551 U.S. 112, 119, 127 S.Ct. 2321, 168 L.Ed.2d 16 (2007) (harmless-error

14   standard applied in federal habeas review of trial-type errors); <u>Williams v. Stewart</u>, 441 F.3d

15   1030, 1055 (9th Cir.) (as amended) (per curiam) ("[V]iolations of the right to compulsory

16   process are subject to harmless error review."), <u>cert. denied</u>, 549 U.S. 1002, 127 S.Ct. 510, 166

17   L.Ed.2d 381 (2006).

18       In subsection (e) of the Criminal Justice Act, 18 U.S.C. § 3006A, Congress has provided

19   that indigent defendants shall receive the assistance of all experts "necessary for an adequate

20   defense." The Supreme Court has recognized that indigent defendants have a due process right

21   to obtain the assistance of a psychiatrist where a defendant's sanity was a "significant factor at

22   trial." <u>See</u> <u>Ake v. Oklahoma</u>, 470 U.S. 68, 83, 105 S.Ct. 1087, 84 L.Ed.2d 53 (1985); <u>Caldwell</u>

23   <u>v. Mississippi</u>, 472 U.S. 320, 323 n.1, 105 S.Ct. 2633, 86 L.Ed.2d 231 (1985). However, the

24   Supreme Court has not extended that right beyond psychiatrists to other expert witnesses. The

25   Ninth Circuit has also limited <u>Ake</u> to psychiatrists. <u>See</u> <u>Jackson v. Ylst</u>, 921 F.2d 882, 886 (9th

26   Cir. 1990).

27       3.    <u>Analysis</u>

28       Petitioner fails to demonstrate that the California Court of Appeal unreasonably rejected

1   this claim.  Rather, the trial court's determination that petitioner was not constitutionally entitled

2   to a new trial is amply supported by the record and did not arbitrarily or disproportionately

3   "infringe upon a weighty interest of the accused," Holmes, 547 U.S. at 324–25, or "significantly

4   undermine[ ] fundamental elements of [his] defense."  See Scheffer, 523 U.S. 303, 315 (1998);

5   Moses, 555 F.3d at 757.

6        Petitioner proposes extending the Supreme Court's holding in Ake to encompass an

7   indigent defendant's request for the appointment of a defense gang expert.  Respondent correctly

8   asserts that there is no clearly established federal law that a defendant is entitled to an expert

9   witness besides a psychiatrist.  See Jackson v. Ylst, 921 F.2d at 886.[4]  However, Petitioner is

10  entitled to meaningful opportunity to present a complete defense.

11       The Fifth District Court of Appeal reviewed defense counsel's efforts in obtaining

12  Hurtado as an expert, defense counsel's failure to use alternative means to secure Hurtado's

13  testimony, defense counsel's role and responsibility for Hurtado's non-appearance at trial, and

14  the nature of the testimony expected from Hurtado.  (LD 4 at 47-51).  Based upon that analysis,

15  the Fifth District Court of Appeal held that the trial court did not abuse its discretion when it

16  denied Petitioner's motion for a mistrial and the subsequent motion for a new trial.  (LD 4 at 50-

17  51).

18       This Court finds that it was not error for the trial court to deny Petitioner's motion for a

19  mistrial and the subsequent motion for new trial.  Petitioner's counsel had secured Hurtado as an

20  expert early in the case.  Although Petitioner's trial counsel did not subpoena Hurtado, it is not

21  customary for a party to subpoena his own witnesses.  See Dunn, 205 Cal.App.4th at 1096.

22  However, the conflicts between Hurtado and Petitioner's counsel over the written report for

23  discovery and the prosecution's challenges to Hurtado's credibility as an expert and Hurtado's

24  busy schedule in December should have alerted Petitioner's counsel that a subpoena could be

25  needed for Hurtado.  Petitioner's counsel turned down the court's offer of a short continuance

26  which could have given counsel the opportunity to see if there were other alternatives to Hurtado

27

28  [4] The Court notes that Ake applies to indigent defendants.  Upon a review of the state court record, Petitioner was
    not an indigent defendant.  Petitioner had retained his own counsel in state court.

testifying or if he could convince Hurtado to testify.  Petitioner's counsel also did not attempt to secure Hurtado's testimony by a deposition.   Therefore, Petitioner did not attempt to use alternative means to secure Hurtado's testimony and Petitioner was responsible for Hurtado's nonappearance.   Therefore, the trial court had not abused its discretion when it denied Petitioner's motion for a mistrial and subsequent motion for new trial.

Accordingly, the California Court of Appeal's rejection of Petitioner's claim was not contrary to, or an unreasonable application of clearly established federal law, or an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.  Thus, Petitioner is not entitled to habeas relief on this claim.

**B.  Ineffective Assistance of Trial Counsel**

Petitioner argues that his trial counsel was ineffective because he failed to retain a gang expert to testify at trial.  Petitioner asserts that it is the lack of a defense gang expert coupled with the unreasonable factual determination concerning the videotape evidence that creates a violation of clearly established Supreme Court precedent.

1.    Fifth Appellate District's Decision

In the last reasoned state court decision, the Fifth Appellate District stated:

> The court denied defendant's new trial motion for defense counsel's alleged ineffective assistance significantly based on its belief that the images on the surveillance videotape could not have been explained any differently if defense counsel had called Hurtado or another defense expert. On appeal, defendant speculates that the jury was unable to clearly watch the videotape during trial and that it likely did not watch the videotape during deliberations. However, the videotape was played for the jury during Officer Carsten's testimony, and there is no evidence that it was unable to view the tape during the trial itself.

> Our review of the videotape shows defendant was in the bar with several other men, whom Officer Carsten identified as Norteno gang members – Madrid, Cervantez, and the Ruiz brothers. The men were generally dressed in black or white, with the exception of one man, identified as Bro, in a red shirt. The bar's security guard testified that Gallegos, the victim, entered the bar with a blue bandana, and displayed it two more times while he was there. However, Carsten never testified that the videotape showed the victim displaying the bandana, and it was not clear whether the victim's head tattoos were visible to defendant and his presumed associates. There is no evidence that gang slurs or slogans were shouted before, during, or after the stabbing. While defendant's

associates assumed various strategic vantage points on and around the dance floor, they did not surround or restrain the victim before or during the stabbing. The videotape seems to show that Bro was closely monitoring Gallegos's general location on the dance floor and defendant's movements around the bar, while Madrid stood off to the side and appeared to watch everyone else. The videotape showed that defendant walked up and stabbed the victim in the back, by himself and without assistance, and then he ran away by himself. His associates resumed their positions in the bar, and they were still there when the police arrived.

The court denied the new trial motion and held it was up to the jury to determine whether the stabbing was gang-related, that Officer Carsten only offered his opinion and speculation about what was depicted on the videotape, and "the jurors can make that decision by looking at the video and listening to the testimony." In making this ruling, however, the court ignored the possibility that while a defense expert would have likely addressed the same factual issues discussed by Carsten, an expert might have offered different opinions from the facts and circumstances of the stabbing.

The record in this case raises several concerns about defense counsel's conduct after Hurtado resigned, particularly his failure to request a continuance or accept the court's offer of a "short" continuance. However, "a court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies," and in many cases, an ineffective assistance claim may be disposed of "on the ground of lack of sufficient prejudice." (*Strickland*, *supra*, 466 U.S. at p. 697.) Defendant "must carry his burden of proving prejudice as a 'demonstrable reality,' not simply speculation as to the effect of the errors or omissions of counsel. [Citation.]" (*People v. Williams* (1988) 44 Cal.3d 883, 937.)

Even if defense counsel was ineffective for failing to take various steps after Hurtado resigned, we cannot conclude that defendant was prejudiced or that the testimony of any other gang expert would have affected the verdict, based on the appellate record before this court. While defendant's motion for new trial alleged ineffective assistance, his motion was not supported by any declarations or exhibits that would have demonstrated the possible prejudice from defense counsel's failure to make any attempt to secure another expert during trial. Defendant failed to establish trial counsel could have presented a defense expert who would have provided favorable testimony to refute Officer Carsten's opinions about the crucial aspects of the stabbing, or that the offer of a short continuance was inadequate. It would be "simply speculation" to find a reasonable probability that the defendant would have obtained a more favorable result.

(LD 4).

2.   Pertinent Law

The clearly established federal law governing ineffective assistance of counsel claims is

1    Strickland v. Washington, 466 U.S. 668 (1984).  In a petition for writ of habeas corpus alleging

2    ineffective assistance of counsel, the court must consider two factors.  Strickland, 466 U.S. at

3    687. First, the petitioner must show that counsel's performance was deficient, requiring a

4    showing that counsel made errors so serious that he or she was not functioning as the "counsel"

5    guaranteed by the Sixth Amendment.  Id. at 687.  The petitioner must show that counsel's

6    representation fell below an objective standard of reasonableness, and must identify counsel's

7    alleged acts or omissions that were not the result of reasonable professional judgment

8    considering the circumstances.  Richter, 562 U.S. at 105 ("The question is whether an attorney's

9    representation amounted to incompetence under "prevailing professional norms," not whether it

10   deviated from best practices or most common custom.") (citing Strickland, 466 U.S. at 688).

11   Judicial scrutiny of counsel's performance is highly deferential.  A court indulges a strong

12   presumption that counsel's conduct falls within the wide range of reasonable professional

13   assistance.  Strickland, 466 U.S. at 687; Sanders v. Ratelle, 21 F.3d 1446, 1456 (9th Cir. 1994).

14   A reviewing court should make every effort "to eliminate the distorting effects of hindsight, to

15   reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from

16   counsel's perspective at that time."  Strickland, 466 U.S. at 669.

17       Second, the petitioner must show that there is a reasonable probability that, but for

18   counsel's unprofessional errors, the result would have been different.  It is not enough "'to show

19   that the errors had some conceivable effect on the outcome of the proceeding.'"  Richter, 131

20   S.Ct. at 787 (internal citation omitted).  A reviewing court may review the prejudice prong first.

21   See Pizzuto v. Arave, 280 F.3d 949, 955 (9th Cir. 2002) (quoting Strickland, 466 U.S. at 697)

22   (holding that a court may dispose of an ineffective assistance of counsel claim on the ground of

23   lack of sufficient prejudice before determining whether counsel's performance was deficient).

24       In effect, the AEDPA standard is "doubly deferential" because it requires that it be shown

25   not only that the state court determination was erroneous, but also that it was objectively

26   unreasonable.  Yarborough v. Gentry, 540 U.S. 1, 5 (2003).  Moreover, because the Strickland

27   standard is a general standard, a state court has even more latitude to reasonably determine that a

28   defendant has not satisfied that standard.  See Yarborough v. Alvarado, 541 U.S. 652, 664 (2004)

1  ("[E]valuating whether a rule application was unreasonable requires considering the rule's
2  specificity.  The more general the rule, the more leeway courts have in reaching outcomes in
3  case-by-case determinations.").

4     3.     Analysis

5     Initially, the Court notes that the Fresno County Superior Court expressly applied
6  Strickland—the correct federal standard—to Petitioner's contentions regarding his counsel's
7  performance.  Hence, the only question is whether, having applied the correct test, the state
8  court's application of Strickland was objectively unreasonable.  Schriro v. Landrigan, 550 U.S. at
9  473.  The Court concludes that it was not, and therefore, the claim must be denied.

10     Petitioner argues that the video was silent and that the jury could not actually see the
11  videotape as part of his argument why his counsel's failure to present a gang expert prejudiced
12  him.  Petitioner's argument is that there was an unreasonable factual determination about
13  whether the jury viewed the videotape.  "Factual determinations by state courts are presumed
14  correct absent clear and convincing evidence to the contrary, § 2254(e)(1), and a decision
15  adjudicated on the merits in a state court and based on a factual determination will not be
16  overturned on factual grounds unless objectively unreasonable in light of the evidence presented
17  in the state-court proceeding."  Miller-El, 537 U.S. at 340 (internal citations omitted).

18     As the Court of Appeal noted, the jury watched the videotape during Officer Carsten's
19  testimony and there is no evidence that the jury was unable to see the videotape.  Although the
20  trial court made comments about the jury's ability to view the videotape at times during trial, the
21  trial court did not state that the jury could not view the videotape when it was played during
22  Officer Carsten's testimony.  (RT 364-386).  The Court also notes that the jury viewed the video
23  during the prosecutor's closing.  (RT 620-632).  In fact, at one point during the prosecutor's
24  closing argument, the trial judge said, "If any of you folks up here want to move down here so
25  you can be closer feel, free to do that."  (RT 622:24-26).  Upon a review of the record, it is clear
26  that the jury viewed the videotape during both Officer Carsten's testimony and the prosecutor's
27  closing argument.  Therefore, the jury did watch the videotape and there is no error in the Court
28  of Appeal's factual determination that the jury watched the videotape.

1   Even if the Court assumes that the jury did not view the videotape during deliberations,

2   Petitioner has not shown that the California Court of Appeal's decision was unreasonable

3   because Petitioner has not shown that he suffered prejudice by his trial counsel's failure to call

4   Hurtado or another gang expert. Petitioner asserts that the only witness testimony that the attack

5   was for the benefit of a gang was by the prosecution's expert witness, Officer Carsten, and that

6   the trial court estopped Petitioner from presenting expert testimony that this crime was not

7   committed for a gang. Petitioner argues that his own testimony was empathic that he was not a

8   gang member and that the attack was motivated by jealousness. The Court finds that the Fifth

9   Appellate District's decision that "It would be "simply speculation" to find a reasonable

10  probability that the defendant would have obtained a more favorable result" is not unreasonable

11  and that the decision to deny Petitioner's claim is not unreasonable.

12   In finding that Petitioner did not suffer any prejudice from Petitioner's failure to call a

13  gang expert, the Fifth Appellate District stated:

14   While defendant's motion for new trial alleged ineffective
    assistance, his motion was not supported by any declarations or
15   exhibits that would have demonstrated the possible prejudice from
    defense counsel's failure to make any attempt to secure another
16   expert during trial. Defendant failed to establish trial counsel could
    have presented a defense expert who would have provided
17   favorable testimony to refute Officer Carsten's opinions about the
    crucial aspects of the stabbing, or that the offer of a short
18   continuance was inadequate.

19  (LD 4 at 56).

20   As stated above, there is no evidence that Petitioner could have presented a defense gang

21  expert who could have provided favorable testimony to Petitioner. Petitioner has not shown that

22  he could have presented a defense expert who would have refuted Officer Carsten's testimony

23  about the stabbing. Petitioner has not presented any evidence that his defense counsel could

24  have convinced Hurtado to return or that there was another gang expert who was available to

25  testify at trial and that would have done so. Petitioner's claims are merely speculation.

26  Furthermore, Petitioner's trial counsel effectively cross-examined Officer Carsten and the jury

27  had the opportunity to evaluate the video evidence and the testimony of the witnesses for both

28  the prosecution and the defense.

1    Based on the foregoing, the Court finds that the California court's rejection of Petitioner's

2  claim was neither contrary to, nor involved an unreasonable application of, clearly established

3  federal law, as determined by the United States Supreme Court.  Thus, habeas relief is not

4  warranted on this claim.

5  **C.  Instructional Error**

6    Petitioner claims that the trial court violated his due process and fair trial rights by

7  including the phrase "gang-related crime" in the CALCRIM No. 1403 jury instruction when he

8  only charged with a gang enhancement.  He also claims that the instruction directed the jury to

9  find that attempted murder was a gang-related crime and that the instruction infected the entire

10  trial so that his due process rights were violated.

11    The Fifth District Court of Appeal found that Petitioner forfeited his claim of

12  instructional error because he failed to "object to the version of CALCRIM No. 1403 given by

13  the court or ask the court to modify the instructional language."   Therefore, Petitioner has

14  procedurally defaulted this claim because of the contemporaneous objection rule.  See Coleman

15  v. Thompson, 501 U.S. 722, 729-30, 111 S.Ct. 2546, 115 L.Ed.2d 640 (1991).  However, the

16  Fifth District Court of Appeal also addressed the merits of the claim and, therefore, this Court

17  will address the merits of the claim.

18    1.  Court of Appeal's Decision

19    The Fifth District Court of Appeal held that:

20/21/22    Defendant raises a second issue about CALCRIM No. 1403, based on the court's selection of certain optional language in the first paragraph, as provided by the pattern instruction. The pattern instruction for CALCRIM No. 1403 offers the following options for the first paragraph, as italicized below:

23/24/25/26    "You may consider evidence of gang activity only for the limited purpose of
deciding whether: [¶] [The defendant acted with the intent, purpose, and knowledge
that are required to prove the gang-related (crime[s]/ [and] enhancement[s]/ [and]
special circumstance allegations) charged(;/.)] …." (Italics added.)

27/28    As set forth ante, the court read the first paragraph of CALCRIM No. 1403 to the jury as follows: "You must consider or you may consider evidence of gang activity only for the limited purpose of

deciding whether the defendant acted with the intent, purpose, and knowledge that are required to prove the gang-related crime and enhancements charged or the defendant had a motive to commit the crime charged." (Italics added.)

Defendant cites to the phrase "the gang-related crime," as italicized ante, and argues the court erroneously used this phrase when it read CALCRIM No. 1403 to the jury in this case. Defendant notes that the disputed issue was whether the charged substantive offense of attempted murder was a gang-related crime. Defendant argues that when the court used the phrase "gang-related crime" in CALCRIM No. 1403's first paragraph, it essentially directed the jury to find that the charged offense of attempted murder was a gang-related crime, and that the jury did not have to address or consider that disputed issue.

Defendant asserts that the phrase "gang-related crime" should only be used when a party is charged with the gang substantive offense pursuant to [California Penal Code] section 186.22, subdivision (a), which was not alleged in this case. Defendant further asserts that the court should have instructed the jury that it could consider the gang evidence for the proof of the gang-related *enhancement*, which would have accurately described the charges in this case.

As with his other instructional issues, defendant did not object to the version of CALCRIM No. 1403 given by the court or ask the court to modify the instructional language. (*Hernandez*, *supra*, 33 Cal.4th at p. 1051.) "Generally, '"[a] party may not complain on appeal that an instruction correct in law and responsive to the evidence was too general or incomplete unless the party has requested appropriate clarifying or amplifying language." ' [Citations.]" (*Samaniego*, *supra*, 172 Cal.App.4th at p.1163.) Having failed to do so, he has forfeited review of this issue.

In any event, we find it is not reasonably likely the jury interpreted the instruction in the manner suggested by defendant. "Motive is always relevant in a criminal prosecution." (*People v. Perez* (1974) 42 Cal.App.3d 760, 767.) Gang evidence is relevant and admissible "*when the very reason for the underlying crime, that is the motive, is gang related.* [Citation.]" (*Samaniego*, *supra*, 172 Cal.App.4th at p. 1167, italics added.) Aside from allegations of the gang enhancement, evidence of a defendant's gang membership and activity may be separately relevant to his motive and intent for committing the charged substantive offense against a rival or suspected rival (*People v. Funes* (1994) 23 Cal.App.4th 1506, 1517-1519; *People v. Williams* (1997) 16 Cal.4th 153, 193-194); or when criminal activity has been preceded by gang signs or identification (*People v. Villegas* (2001) 92 Cal.App.4th 1217, 1222, 1224).

In this case, the court properly admitted the gang evidence as relevant and probative for the [California Penal Code] section 186.22, subdivision (b) gang enhancement, and also for defendant's motive and intent to commit the charged offense of attempted murder. The prosecution's theory of the case was that

defendant was guilty of attempted murder and not some lesser offense, based on evidence that defendant was a Norteno, he was at the bar with other Nortenos, they saw Gallegos enter the bar, Gallegos showed the blue bandana and had Sureno tattoos, and defendant attempted to murder Gallegos because of the gang rivalry and to gain respect from the Nortenos. While defendant admitted that he stabbed Gallegos, he testified that he was upset because of his prior relationship with Echavarria, he knew he was too intoxicated to fight with Gallegos, and he decided to stab him instead. Defense counsel argued that defendant was not guilty of attempted murder but might be guilty of attempted voluntary manslaughter because he acted in the heat of passion, while he was drunk, when he saw Echavarria with Gallegos.

The gang evidence was thus relevant to establish defendant's motive and intent to murder Gallegos because of the Norteno/Sureno gang rivalry, and not because he was upset that Gallegos was there with a former girlfriend. The gang evidence was also relevant and admissible to prove the elements of the gang enhancement. Given the dual relevancy of the evidence, the court did not commit error when it instructed the jury that it could consider the gang evidence to determine whether defendant committed "the gang-related crime and enhancements charged or the defendant had a motive to commit the crime charged."

(LD 4 at 7173).

### 2. Pertinent Law

Petitioner's claim that a jury instruction was incorrect under state law does not state a cognizable claim in a federal habeas petition. See Estelle v. McGuire, 502 U.S. 62, 67-68, 112 S.Ct. 475, 116 L.Ed.2d 385 (1991) ("[W]e reemphasize that it is not the province of a federal habeas court to reexamine state-court determinations on state-law questions."); Lincoln v. Sunn, 807 F.2d 805, 816 (9th Cir. 1987) ("Incorrect state court evidentiary rulings cannot serve as a basis for habeas relief unless federal constitutional rights are affected.").

To obtain federal collateral relief for errors in the jury charge, a petitioner must show that the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process. Estelle, 502 U.S. at 72. Additionally, the instruction may not be judged in artificial isolation, but must be considered in the context of the instructions as a whole and the trial record. Id. The Court must evaluate jury instructions in the context of the overall charge to the jury as a component of the entire trial process. See United States v. Frady, 456 U.S. 152, 169, 102 S.Ct. 1584, 71 L.Ed.2d 816 (1982) (citing Henderson v. Kibbe, 431 U.S. 145, 154, 97 S.Ct. 1730, 52

1    L.Ed.2d 203 (1977)).

2          Furthermore, even if it is determined that the instruction violated the petitioner's right to

3    due process, a petitioner can only obtain relief if the unconstitutional instruction had a substantial

4    influence on the conviction and thereby resulted in actual prejudice under Brecht, 507 U.S. at

5    637.  See Hanna v. Riveland, 87 F.3d 1034, 1039 (9th Cir. 1996).  The burden of demonstrating

6    that an erroneous instruction was so prejudicial that it will support a collateral attack on the

7    constitutional validity of a state court's judgment is even greater than the showing required to

8    establish plain error on direct appeal."  Id.

9          3.  Analysis

10         Petitioner argues that it was reasonably likely that the jury understood the instruction,

11   especially in the context of the jury charge as a whole, to mean that the attempted murder was a

12   gang crime as a matter of law, and therefore, there was a directed verdict.  Respondent argues

13   that the gang evidence in Petitioner's case was relevant to prove not only the elements of the

14   gang enhancement, but also Petitioner's motive and intent for attempting to murder the victim.

15         At the conclusion of the evidence, the jury was told:

16                 Some of these instructions may not apply, depending on your
                   findings about the facts of the case. Do not assume just because I
17                 give a particular instruction that I am suggesting anything about
                   the facts. After you have decided what the facts are, follow the
18                 instructions that do apply to the facts as you find them.

19   (RT 587:18-23).

20         The jury was instructed the jury that, "Unless the evidence proves the defendant guilty

21   beyond a reasonable doubt, he is entitled to an acquittal, and you must find him not guilty. (RT

22   589:26-590:2).  The following modified version of CALCRIM No. 1403 was read to the jury:

23                 You must consider or you may consider evidence of gang activity
                   only for the limited purpose of deciding whether the defendant
24                 acted with the intent, purpose, and knowledge that are required to
                   prove the gang-related crime and enhancements charged or the
25                 defendant had a motive to commit the crime charged.

26   (RT 608:5-11).

27         To prove attempted murder, the prosecution was required to show that Petitioner had the

28   specific intent to kill and committed a direct but ineffectual act toward accomplishing the

                                              38

1   intended killing.  People v. Lee, 31 Cal.4th 613, 623, 3 Cal.Rptr.3d 402, 74 P.3d 176 (2003)

2   (citations omitted).  Since there is rarely direct evidence of a defendant's intent, it "must usually

3   be derived from all the circumstances of the attempt, including the defendant's actions."  People

4   v. Chinchilla, 52 Cal.App.4th 683, 690, 60 Cal.Rptr.2d 761 (1997).

5          Evidence was presented at trial that Petitioner saw the victim in the bar, walked toward

6   the victim, took the box cutter out of his pocket, and stabbed the victim in the back of his head

7   and neck.  The jury logically relied on these facts, not gang evidence, to find intent to kill the

8   victim.  The evidence reasonably supports the inference that Petitioner harbored the specific

9   intent to kill the victim.  Based on the considerable evidence of intent to kill in this case, there is

10  no reason to believe that the instructional error had a substantial and injurious effect on

11  Petitioner's trial or the jury's verdict.

12         The Court finds that the California state courts' rejection of Petitioner's claim was neither

13  contrary to, nor involved an unreasonable application of, clearly established federal law, nor was

14  it based on an unreasonable determination of the facts.  Thus, Petitioner is not entitled to habeas

15  relief and the petition for writ of habeas corpus is denied.

16         **D.     Certificate of Appealability**

17         A state prisoner seeking a writ of habeas corpus has no absolute entitlement to appeal a

18  district court's denial of his petition, and an appeal is only allowed in certain circumstances.

19  Miller-El, 537 U.S. at 335-36.  The controlling statute in determining whether to issue a

20  certificate of appealability is 28 U.S.C. § 2253, which provides as follows:

21
22             (a) In a habeas corpus proceeding or a proceeding under section
               2255 before a district judge, the final order shall be subject to
               review, on appeal, by the court of appeals for the circuit in which
23             the proceeding is held.

24             (b) There shall be no right of appeal from a final order in a
               proceeding to test the validity of a warrant to remove to another
25             district or place for commitment or trial a person charged with a
               criminal offense against the United States, or to test the validity of
26             such person's detention pending removal proceedings.

27             (c) (1) Unless a circuit justice or judge issues a certificate of
                   appealability, an appeal may not be taken to the court of
28                 appeals from–

(A) the final order in a habeas corpus proceeding in which the detention complained of arises out of process issued by a State court; or

(B) the final order in a proceeding under section 2255.

(2) A certificate of appealability may issue under paragraph (1) only if the applicant has made a substantial showing of the denial of a constitutional right.

(3) The certificate of appealability under paragraph (1) shall indicate which specific issue or issues satisfy the showing required by paragraph (2).

If a court denies a petitioner's petition, the court may only issue a certificate of appealability "if jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." Miller-El, 537 U.S. at 327; Slack v. McDaniel, 529 U.S. 473, 484 (2000). While the petitioner is not required to prove the merits of his case, he must demonstrate "something more than the absence of frivolity or the existence of mere good faith on his . . . part." Miller-El, 537 U.S. at 338.

In the present case, the Court finds that reasonable jurists would not find the Court's determination that Petitioner's petition should be denied debatable, wrong, or deserving of encouragement to proceed further. Petitioner has not made the required substantial showing of the denial of a constitutional right. Accordingly, the Court hereby declines to issue a certificate of appealability.

\\\

\\\

\\\

\\\

\\\

\\\

\\\

\\\

\\\

**IV.**

**ORDER**

Based on the foregoing, IT IS HEREBY ORDERED that:

1) The petition for writ of habeas corpus is DENIED;

2) The Clerk of Court is DIRECTED to close the case; and

3) The Court DECLINES to issue a certificate of appealability.

IT IS SO ORDERED.

Dated:   **February 8, 2016**

_____

UNITED STATES MAGISTRATE JUDGE